**Casey CAMPBELL, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 98–199.**

Supreme Court of Wyoming.

March 16, 2000.

---

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna Domonkos, Appellate Counsel; Diane Courselle, Director, Wyoming Defender Aid Program; and Katina Francis and Leslie Scalley, Student Interns, Wyoming Defender Aid Program. Argument by Ms. Francis and Ms. Scalley.

Representing Appellee: Gay Woodhouse, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Hugh Kenny, Senior Assistant Attorney General. Argument by Mr. Kenny.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and HILL, JJ.

GOLDEN, Justice.

Appellant Casey Campbell appeals her conviction for felony child endangerment contending that constitutional and evidentiary errors require reversal.

We affirm the order of judgment and sentence.

## ISSUES

Campbell presents these issues:

1. Whether the five-hundred thirty-six day delay from Casey Campbell's arrest until her trial, during which she was subjected to four preliminary hearings, violated Casey Campbell's right to a speedy trial.

2. Whether Wyoming's child endangerment statute is void for vagueness facially and as applied to the facts in the case because it provides no standard of conduct or notice of forbidden conduct and it allows for arbitrary and discriminatory enforcement.

3. Whether the trial court deprived Casey Campbell of the opportunity to put on a defense in refusing an instruction on coercion and duress when it was a proper statement of the defense theory and it was supported by sufficient evidence at trial.

4. Whether the trial court denied Casey Campbell statutory rights and due process of law by having conferences off the record with two prospective jurors in the absence of Ms. Campbell.

5. Whether Casey Campbell was deprived of a fair trial when the prosecutor (1) elicited two witnesses' opinions that Casey Campbell was guilty, (2) introduced inflammatory and irrelevant photographs of [HC's] burns, (3) engaged in a variety of other improper and inflammatory tactics such as appealing to racial bias, shifting the burden of proving Floid's abuse to Casey Campbell, and

otherwise irrelevant and prejudicial tactics.

The State rephrases the issues as:

I. Are delays due to appellant's insistence on creation of a meaningless record sufficient to establish a speedy trial violation?

II. Has appellant carried her burden of showing that Wyo. Stat. § 6–4–403(a)(ii) fails to establish any standards of conduct and is thus unconstitutionally vague?

III. Did the trial court err when it rejected appellant's coercion defense as unsupported by the evidence?

IV. Does the record support appellant's claim of "exclusion" from voir dire sufficient to make out a claim of denial of due process?

V. Was appellant denied a fair trial?

## FACTS

In 1992, Casey Campbell's eight-month-old daughter, HC, suffered severe injuries at the hands of Campbell's live-in boyfriend, Floid Boyer. The Department of Family Services (DFS) removed HC from Campbell's custody and placed her in foster care. Campbell was convicted of misdemeanor child endangerment. HC was returned to her mother's care on September 16, 1994. Campbell still lived with Boyer and her two other children that he had fathered since HC was removed. On June 27, 1995, while left alone with Boyer, HC received second and third degree burns over eighteen percent of her body. The burns were on the left side of her body from below her shoulders, extending down her left side, thigh and leg.

Boyer admitted causing the burns but claimed the burns were inflicted when he tripped and spilled coffee on the child sometime during the day. Shortly after 7:00 p.m. that evening, Campbell arrived home from work with a friend and the friend's fourteen-year-old daughter who planned to babysit Campbell's children that evening. The three observed the burns and at least one large blister. The friend recommended that Campbell take HC to the doctor. Campbell and Boyer decided not to follow that advice and, without providing medications for the babysitter, left to play darts at a local bar. The babysitter observed that HC was in pain that evening and dressed her in a large t-shirt. The babysitter confirmed that photographs taken of HC's burns hours later at the hospital accurately reflected the appearance of the burns at 7:00 p.m. that evening. Campbell and Boyer returned home at midnight. By 2:00 a.m., HC's pain was severe, and Campbell decided the burns were serious and required that she take HC to the hospital. Campbell wrapped the child, placed her in a stroller, and walked the few blocks to the hospital.

The treating physician was the same doctor who had cared for HC in 1992. Although Campbell explained that the burns were caused by spilled coffee, the doctor believed the injuries were not consistent with hot liquid as the source. The police were contacted, and a criminal investigation began. Police went to the home and checked the carpet where Boyer alleged that he had spilled the coffee, finding no signs of a spill because the carpet was dry as was the padding underneath, and there was a layer of chalky dust underneath the pad. Boyer agreed to questioning at the police station, and DFS was contacted to care for the two children still in the home. The conditions of the home were deemed deplorable, and DFS decided that Campbell's other two children should be placed in protective custody. Eventually, these two children were placed with Boyer's parents.

Campbell was arrested on charges of child abuse and child endangerment, released on bond, and had a preliminary hearing. The record is not complete on all dates, but both parties agree that recording problems at the preliminary hearing prevented defense counsel from procuring a transcript of the proceedings, and, at defense counsel's request, the trial court remanded for a new preliminary hearing because the first had not been recorded as required by W.R.Cr.P. 55. Recording problems at the new hearing and the next were also faulty. The court determined that the State dismissed the indictment and refiled three times. A fourth preliminary hearing successfully produced a transcript,

and Campbell filed a motion to dismiss for speedy trial violation on December 6, 1996, and filed a demand for speedy trial on December 9, 1996. Defense counsel also filed motions to suppress the photographs of the burns and to exclude evidence of HC's previous injuries and Campbell's misdemeanor child endangerment conviction for that incident. Following a hearing on December 11, 1996, the trial court granted the motion with respect to the misdemeanor conviction but allowed evidence of the previous injuries, and denied the motion to suppress the photographs.

On December 16, 1996, shortly before trial began, the State agreed to dismiss the child abuse charge. At that time, the court also reconsidered its ruling prohibiting the State from presenting Campbell's misdemeanor conviction as an element of the offense of felony child endangering. The district court ruled that the previous conviction was not a matter for the jury, but was a matter for the court to decide at sentencing. Also at that time, defense counsel requested a continuance so that it could explore a battered woman's syndrome defense. That continuance was denied, and Campbell went to trial. Before Campbell's trial, Boyer pled guilty to misdemeanor child endangerment.

At trial, the State alleged that Campbell had failed to protect HC from Boyer although she knew Boyer was abusive to the child and failed to get immediate medical care for HC after observing her injuries. The State contended that the unclean condition of Campbell's home required immediate attention because of the risk of infection to a burn victim. In support of its failure to protect claim, the State contended that Campbell knew Boyer was a danger to HC because he disliked HC because he was not her father and because HC was of a different race. In Campbell's defense, Boyer testified that he thought he was HC's father, and had spilled coffee on the child accidentally, causing the burns. He testified that Campbell wanted to take the child to the hospital at 7:00 p.m. that evening, but that he believed the burns were not serious enough to require them to forgo playing darts. He testified that he had been physically abusive to Camp-

bell for years, and he believed that Campbell played darts that night to avoid angering him. Campbell testified that she had been abused by her brother since she was seven years old, by her stepfather since a teenager, and by Boyer since she was sixteen years old, and Boyer had violently assaulted her with knives and guns on past occasions. At the time of HC's injuries, she feared for herself and HC if she defied Boyer that night by refusing to play darts. By 2:00 a.m., she believed that HC's condition had changed because she now had blistered severely, and Boyer and Campbell both testified that they agreed that the child should be taken to the hospital for medical care.

At the jury instruction conference, the defense requested an instruction on the defense of duress and coercion. This instruction was denied by the district court. Campbell was convicted of felony child endangerment and sentenced to prison.

## DISCUSSION

### Speedy Trial

■ The State filed charges on June 28, 1995. Campbell was tried on December 16, 1996. During the 536-day delay, Campbell received four preliminary hearings because recording problems left her defense attorneys without a transcript record. Speedy trial violations are reviewed under W.R.Cr.P. 48 and a constitutional balancing test. Both parties agree that Rule 48 was not violated and review is limited to a constitutional analysis of the four factors identified in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), and adopted by this Court in *Cosco v. State*, 503 P.2d 1403, 1405 (Wyo.1972), *cert. denied*, 411 U.S. 971, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973). This test requires us to consider the length of delay; the reason for the delay; the defendant's assertion of his right; and the prejudice to the defendant. *Hall v. State*, 911 P.2d 1364, 1370-71 (Wyo.1996).

■ The filing of the criminal complaint or arrest of the defendant begins the speedy trial clock under the constitutional analysis. *Whiteplume v. State*, 841 P.2d 1332, 1335 (Wyo.1992). A delay of over 500 days is

presumptively prejudicial and serves to warrant a speedy trial analysis. *Springfield v. State,* 860 P.2d 435, 451 (Wyo.1993).

The reason for the delay cannot be attributed to either the prosecution or the defense. The record does not show that the government was to blame nor do we consider it improper for the defense to insist upon a record of a preliminary hearing. W.R.Cr.P. 55 requires that the proceedings be recorded, and W.R.Cr.P. 5.1 affords the parties the right to have preliminary hearing information made available for preparation of trial. The parties tell us that the first preliminary hearing was held on July 10, 1995. Defense counsel withdrew on August 22, 1995, and new counsel informed the district court on September 22, 1995, that the recording was inadequate. Although not constitutionally required to order a new preliminary hearing, on January 3, 1996, the district court exercised its discretion and granted one. *Sidwell v. State,* 964 P.2d 416, 419 (Wyo.1998). That hearing and the next were not properly recorded, and each time defense counsel requested a new hearing. The district court exercised its discretion and granted each request. Accordingly, we find that recording problems represent a delay caused by a neutral factor. We accord less weight to delays not attributable to the prosecution. *Osborne v. State,* 806 P.2d 272, 278 (Wyo.1991). The record does not present any reason to give these delays any effective weight toward supporting a speedy trial claim.

The defendant did not assert the right to a speedy trial until December 9, 1996, a few days before trial began. Because less than vigorous assertions of the right to a speedy trial are given little weight, this factor, too, weighs against a speedy trial claim. *Hall,* 911 P.2d at 1371 (citing *Yung v. State,* 906 P.2d 1028, 1033 (Wyo.1995); *Robinson v. State,* 627 P.2d 168, 171 (Wyo.1981)).

Finally, we consider the degree of prejudice suffered by the defendant. Prejudice to the defendant may consist of lengthy pretrial incarceration, pretrial anxiety, or impairment of the defense. Although prejudice is a very important factor in our speedy trial analysis, pretrial anxiety is the least signifi-

cant. *Springfield,* 860 P.2d at 451; *Yung,* 906 P.2d at 1033. Because a certain amount of pretrial anxiety naturally exists, Campbell must demonstrate that she suffered prejudice in an extraordinary or unusual manner. *Hall,* 911 P.2d at 1371.

Campbell was free on bond throughout the period and contends that she was prejudiced by extraordinary pretrial anxiety due to the lengthy period between arrest and trial. We give no weight to this bare assertion because it asserts nothing extraordinary or unusual beyond the anxiety that this Court recognizes as natural. At oral argument, she argued that she was prejudiced by the lengthy separation from her children. The record shows that HC had been in Campbell's care since September 16, 1994, less than one year before she was burned. She had been in foster care for approximately two and a half years before she was returned. On the day of Campbell's arrest, HC was again taken into protective custody by DFS because of her injuries. Campbell's other two children were also taken into DFS' custody because of the condition of the home. After Campbell was released on bond, she was permitted contact with the children according to DFS rules. This record indicates that her separation from her children was for reasons other than reasons associated with pretrial detention. Nothing in the record indicates that she would have been reunited with her children had there been no delay, and we find no prejudice to her on this assertion. The possibility of prejudice due to pretrial anxiety generated by the lengthy delay is not sufficient to support finding that her speedy trial rights were violated.

Although a 536–day delay between arrest and trial is presumptively prejudicial, Campbell asserted her speedy trial rights only days before the trial. The delay was caused by neutral factors and resulted in no actual prejudice to her. Campbell's speedy trial rights were not violated.

### Statutory Vagueness

In her second argument, Campbell attacks the child endangerment statute as facially vague and as applied to the facts of her case. She contends that it is facially vague because

the statute specifies no standard of conduct at all.

Wyo. Stat. Ann. § 6–4–403 (LEXIS 1999) states:

(a) No parent, guardian or custodian of a child shall:

\* \* \*

(ii) Knowingly or with criminal negligence cause, permit or contribute to the endangering of the child's life or health by violating a duty of care, protection or support.

▆▆▆▆▆ Challenging a statute for unconstitutionally facial vagueness requires demonstrating that the statute reaches a substantial amount of constitutionally protected conduct; or the statute specifies no standard of conduct at all. *Luplow v. State*, 897 P.2d 463, 467 (Wyo.1995); *McCone v. State*, 866 P.2d 740, 745 (Wyo.1993). The ultimate test under a vagueness challenge is whether a person of ordinary intelligence could read the statute and comprehend what conduct is prohibited. *Luplow*, 897 P.2d at 467; *Sanchez v. State*, 567 P.2d 270, 274 (Wyo.1977). "A statute employs a standard, for purposes of vagueness, if 'by [its] terms or as authoritatively construed [it applies] without question to certain activities, but whose application to other behavior is uncertain.'" *Luplow*, 897 P.2d at 466 (quoting *Griego v. State*, 761 P.2d 973, 976 (Wyo.1988) (emphasis omitted)). "[L]aws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Griego*, 761 P.2d at 976.

▆▆▆▆▆ "[E]very law must be presumed to be constitutional, with all doubt resolved in its favor." *Luplow*, 897 P.2d at 466; *Keser v. State*, 706 P.2d 263, 266 (Wyo.1985). In considering statutory language, the plain, ordinary and usual meaning of the words used controls in the absence of clear statutory provisions to the contrary. *Keser*, 706 P.2d at 266. Generally, penal statutes are to be

strictly construed; however, they need not be given unnecessarily narrow meaning in disregard of the obvious legislative purpose and intent. *Id.*

▆▆▆▆ Campbell contends that the child endangerment statute is standardless because the term "endangering of the child's life or health by violating a duty of care, protection or support" provides no guidance as to what behavior definitively falls within the prohibited conduct. In *Keser*, a vagueness challenge was made to the terms "physical injury" and "mental trauma" in the child abuse statute, Wyo. Stat. Ann. § 6–2–503. In rejecting that challenge, we recognized that child protection statutes tend to be general in their terms:

"The relationship between parents or guardians and children is a delicate and complex one, and standards designed to regulate this relationship must necessarily provide some flexibility while at the same time effectuating the state policy of protecting children from abuse."

*Keser*, 706 P.2d at 267 (quoting *People v. Jennings*, 641 P.2d 276, 280 (Colo.1982)).

*Keser* noted that California rejected a vagueness challenge to a statute punishing "whoever, having the care of custody of any child, ... wilfully causes or permits such child to be placed in such situation that its person or health may be endangered," and Ohio upheld a statute stating that "no person, being the parent ... of a child under eighteen ... shall create a substantial risk to the health or safety of such child, by violating a duty of care protection or support." *Id.* (citing *People v. Beaugez*, 232 Cal.App.2d 650, 43 Cal.Rptr. 28 (1965); *State v. Sammons*, 58 Ohio St.2d 460, 391 N.E.2d 713 (1979)). *Keser's* rejection of the vagueness challenge was based on the rationales of those decisions and others considering the issue.

Since *Keser* was decided, Nebraska has considered the contention that "endangered" was too vague and indefinite to be constitutional. *State v. Crowdell*, 234 Neb. 469, 451 N.W.2d 695, 699 (1990). It defined the term to mean "to expose a minor child's life or health to danger or the peril of probable harm or loss." *Id.* at 699. Just as *Keser*

noted the necessity that child protection statutes be general, *Crowdell* also determined that

[a]s a matter of practicability for general application, child abuse statutes, by virtue of the nature of their subject matter and the nature of the conduct sought to be prohibited, usually contain broad and rather comprehensive language.

*Id.* at 699. Both *Crowdell* and *Keser* took note of the observation *Beaugez* made about a California statute imposing criminal liability on one who "causes or permits the life or limb of such child to be endangered."

The type of conduct which [this] statute seeks to reach defies precise definition. In number and kind the situations where a child's life or health may be imperiled are infinite. Yet the aim of the statute is not obscure and its objective is a salutary social one. It seeks to protect children from wilful mistreatment whether directly or indirectly applied.

*Crowdell,* 451 N.W.2d at 699; *Keser,* 706 P.2d at 267.

*Crowdell* noted that numerous decisions have upheld against facial vagueness challenges the constitutionality of child protection statutes that contain the word "endanger" or similar language. *Crowdell,* at 699–700. All of these decisions ultimately concluded that some form of the term "endanger" has an easily and commonly understood meaning and is not vague. *Id.* We agree with these decisions. The statutory language of Wyo. Stat. Ann. § 6–4–403 is necessarily broad to achieve the legislative purpose of protecting children against conduct that exposes a minor child's life or health to danger or the peril of probable harm or loss. The statute is not unconstitutionally vague because it does not enumerate the kinds of prohibited conduct; it is sufficiently definite to give notice concerning the criminal conduct prohibited by the statute and does not violate the due process right to know what criminal conduct is proscribed.

 Campbell also contends that the statute is vague as applied to her. "Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *Sorenson v. State,* 604 P.2d 1031, 1034 (Wyo.1979) (footnote omitted) (quoting *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975); *United States v. National Dairy Products Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963)). We must determine whether Campbell could reasonably understand that delaying eight hours in seeking medical care or failing to protect HC from Boyer's abuse is prohibited criminal conduct.

The State contends that Campbell endangered HC's life or health by failing to immediately seek medical care after seeing the burns when the lack of cleanliness in her home necessitated medical care without delay. The babysitter and her mother both saw the burns at the same time that Campbell first saw them and testified they believed the child required medical care and had so advised Campbell. Campbell herself testified that she believed the child needed medical care but was too afraid of Boyer to insist upon it at the time. The treating physician testified that the burns required immediate medical attention because of the risk of infection. Campbell did not seek immediate medical care but instead delayed for an eight hour period. Her testimony establishes that she understood that HC probably required immediate medical care and that she as the parent had the duty to provide that care. On this theory of child endangerment, the statute is not unconstitutionally vague as applied.

 The State's failure to protect theory is more difficult to resolve. The State contends that "[t]he statute points squarely at any mother who would fail to take reasonable steps to protect her child from known abuse." The State contends that the "known abuse" is the past abuse that HC suffered at the hands of Boyer and that Campbell "fully realized that she had a 'duty to protect' [HC] and that if she made any admission that her 'significant abuser' had been posing a danger to her child prior to the incident in question she would be convicted." The State submitted evidence of Boyer's 1992 abuse of HC which led to DFS removing HC from the home in support of its contention that Campbell had failed to protect HC from known

abuse. Our concern with the State's contentions is that, if accepted, we would in essence be finding that Campbell was guilty of child endangerment as soon as she accepted the return of custody of her child because she still lived with Boyer. The State, however, also knew that a potentially abusive situation remained at Campbell's home for HC because of Boyer's presence, and, despite that knowledge, DFS agreed that physical custody should be returned to Campbell, and the district court granted legal custody to Campbell. Upon these particular facts, we do not think that Campbell would know that accepting the return of HC's custody would violate the child endangerment statute. Accepting custody of one's child from the State while living with the abuser of whom the State knows does not violate the child endangerment statute.

██ One's suspicion that the abuser would again harm the child and failure to act despite the suspicion, however, is child endangerment, and evidence at trial established that Campbell held this belief. Campbell testified that Boyer continued to abuse her and she suspected that Boyer was abusing HC as well, specifically testifying as follows:

Q. You told Crystal Spaulding yourself that you were afraid to leave [HC] alone with Floid because you knew that some day he would hurt her?

A. I may have said that.

Q. Yet you still allowed her to come in contact with Floid. Is that true?

A. Yes, I did.

Q. You don't see anything wrong with that?

A. Yes, I do.

Despite these fears, Campbell did leave HC alone with Boyer on the day that Boyer burned the child, and then permitted Boyer's further abuse of HC by agreeing with him that she would not seek medical care. Inaction, complicity, or permitting child abuse constitutes child endangerment for failing to protect a child from a dangerous situation, and Campbell's testimony establishes she knew that her conduct was prohibited. Under this theory, the statute is not unconstitutionally vague as applied.

## Coercion and Duress

In her next issue, Campbell requests that this Court recognize that her status as a battered woman alters the elements of a coercion or duress defense. The trial court denied the defense's requested instruction on the defense of coercion and duress, finding no evidence of imminent bodily harm. Campbell contends that her years of abuse established evidence of her belief of an imminent danger of death or great bodily harm if she refused Boyer's demand that she leave HC to play darts. The State contends that the district court properly determined that the element of present, imminent or impending harm for a coercion or duress defense had not been met by Campbell's belief.

██ Coercion or duress has been recognized as a defense to criminal charges, other than a charge of taking the life of an innocent person. *Amin v. State*, 811 P.2d 255, 260 (Wyo.1991). Coercion or duress must be present, imminent or impending, and of such a nature so as to induce a well-grounded fear of death or serious bodily harm if the otherwise criminal act is not done. *Id.* The burden of demonstrating the elements of such a defense is upon the defendant. *Id.*

██ Campbell contends that she demonstrated that Boyer's past abuse of her reasonably put her in fear of imminent death or serious bodily harm if she did not agree to go play darts that night. Conceding that her subjective fear alone does not support a theory of coercion or duress, she argues that her apprehension was objectively reasonable because she acted "under threats or conditions that a person of ordinary firmness would have been unable to resist," quoting *United States v. Bailey*, 444 U.S. 394, 409, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980). She contends that her years of abuse reasonably caused her to decide that a coffee burn with little visible blistering did not justify provoking an argument with her abuser, and an abused woman of ordinary firmness would have feared for her life that night if she acted to care for HC. The State contends that the court properly refused the instruction because this evidence does not establish

present, imminent or impending death or serious bodily harm by refusing Boyer's demand that she not care for the child and play darts.

■ In response to this argument, Campbell contends that she should be able to raise the affirmative defense of coercion and duress if the abuse she suffered caused her to believe that she was in imminent danger of death or serious bodily harm if she did not endanger her child's life or health by delaying medical care in similar fashion to that permitted under the statute allowing expert evidence of battered woman syndrome in Wyo. Stat. Ann. § 6–1–203(b) (LEXIS 1999). That statute provides:

(a) The "battered woman syndrome" is defined as a subset under the diagnosis of Post–Traumatic Stress Disorder established in the Diagnostic and Statistical Manual of Mental Disorders III—Revised of the American Psychiatric Association.

(b) If a person is charged with a crime involving the use of force against another, and the person raises the affirmative defense of self-defense, the person may introduce expert testimony that the person suffered from the syndrome, to establish the necessary requisite belief of an imminent danger of death or great bodily harm as an element of the affirmative defense, to justify the person's use of force.

The statute's plain language expressly limits its reach to the affirmative defense of self-defense. Self-defense does not apply when charged with child endangerment.

■ We are therefore limited to the elements established under the common law defense, and the issue is whether she presented evidence that she faced present, imminent or impending death or serious bodily harm if she acted to care for the child on the night burned. *Amin,* 811 P.2d at 261. A trial court commits reversible error if it fails to submit a requested instruction that properly articulates Wyoming law, is supported by competent evidence, and is not already presented by another instruction. *Oien v. State,* 797 P.2d 544, 548–50 (Wyo.1990). The evidence established that others were present in the house at the time Campbell made her decision and did not witness Campbell's

refusing to play darts or witness Boyer's threatening Campbell if she cared for her child. Campbell made no attempt to seek medical advice, take her daughter to the hospital, dress her in loose clothing, or give her medications either for pain or to prevent infection. Campbell testified that she recognized that the burns were extensive and serious and required medical care, and she decided not to seek medical care because her past abuse caused her to realize that she would provoke Boyer. We agree with the district court that this record does not establish that she faced present, imminent or impending death or serious bodily harm, and the district court did not err in refusing to give her defense instruction.

*Right to Be Present*

During voir dire, two prospective jurors spoke with the district court and counsel during off-the-record bench conferences. Campbell contends that she was excluded from a critical stage of trial when she was not present during these discussions with potential jurors about their biases. Both jurors were seated on the jury, and one served as foreperson. The State contends that because Campbell was present during voir dire, her failure to request that she be included in the conferences and her failure to object to the seating of either juror constitute waiver.

This Court has stated:

The Sixth Amendment and the due process clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States are held to guarantee an accused the right to be present during every stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure. *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987); *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970). Wyo. Const. art. 1, § 10 "is even more explicit in its guarantee to an accused of the right of presence at trial * * *." *Maupin v. State,* 694 P.2d 720, 722 (Wyo.1985).

" 'The right to be present at trial stems in part from the fact that by his physical presence the defendant can hear and see the proceedings, can be seen by the jury, and can participate in the presentation of his rights. * * *' *Bustamante v. Eyman*, 456 F.2d 269, 274–275 (9th Cir. 1972)."

*Maupin*, 694 P.2d at 723. These constitutional guarantees are incorporated into Wyo. Stat. § 7–11–202 and W.R.Cr.P. 43(a), which provide that a defendant shall be present "at every stage of the trial * * *."

*Seeley v. State*, 959 P.2d 170, 177 (Wyo.1998).

The defendant shall be present at every stage of the trial, including the impaneling of the jury. W.R.Cr.P. 43(a). Examination of prospective jurors requires the presence of the defendant. *Williams v. State*, 292 Md. 201, 438 A.2d 1301, 1309 (1981). The constitutional right to be present at every critical stage of the trial may be waived by a defendant's voluntary absence. *Maupin v. State*, 694 P.2d 720, 722 (Wyo. 1985). The waiver of the right to be present, however, must be knowingly and voluntarily made. *Id. Williams* held that, when other constitutional rights are not implicated such as the Sixth Amendment right of confrontation, a defendant represented by counsel can waive the right to be present at a bench conference during voir dire by counsel's inaction or acquiescence. *Williams*, 438 A.2d at 1310. Similarly, the United States Supreme Court has ruled that a failure to object to a defendant's exclusion from a conference between a judge and a juror waived the right to be present under the F.R.Cr.P 43. *United States v. Gagnon*, 470 U.S. 522, 528, 105 S.Ct. 1482, 1485, 84 L.Ed.2d 486 (1985). We have not previously addressed the issue.

Campbell directs our attention to *Larson v. Tansy*, 911 F.2d 392 (10th Cir.1990). In that case, a defendant was absent from his entire trial. The court determined that the defendant had a right to be present during jury instruction, closing arguments, and the

rendering of the verdict but no due process violation occurred by his absence from the jury instruction conference. The court next considered waiver because the record indicated that counsel had expressly waived defendant's right to be present at trial. The court stated that other federal circuits have held that defense counsel cannot waive a defendant's right of presence at trial. *Id.* at 396. *Larson* found that the defendant did not waive his right to be present but confined the holding to the facts of the case. *Id.* at 397. Campbell also directs our attention to *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 137, 36 L.Ed. 1011 (1892), a United States Supreme Court ruling that the right to be present may not be exercised by the presence of counsel alone. She urges us to hold that a defendant can waive this right only in open court or on the record. We have recognized that *Lewis* has been limited by later Supreme Court decisions. *Weddle v. State*, 621 P.2d 231, 237 (Wyo.1980). Still, we acknowledge Campbell's point that the United States Supreme Court has not settled the issue of whether defense counsel may waive a defendant's right to be present at trial proceedings that she asserts involve "the classic type of factual judgments with which a defendant is capable of assisting." [1]

The record shows that, before voir dire, the district court advised the potential jurors that each should feel free to approach the bench and visit with the judge and the attorneys in order to protect confidential or sensitive information. During voir dire, a juror approached the bench following a question about whether anyone knew Casey Campbell. Campbell contends that the juror's acquaintance with her is something of which she would have special knowledge. The second juror approached the bench in response to a question about whether any of the jurors had been arrested for a crime. Campbell contends that she was entitled to be present because this conference, like the first, did not involve purely legal questions. We agree that arguably it should be presumed that the two jurors were discussing potential biases

---

**1.** In dicta, the United States Supreme Court has referred to the right to be present during trial as an example of one of several "basic rights that the attorney cannot waive without the fully in-

formed and publicly acknowledged consent of the client." *Taylor v. Illinois*, 484 U.S. 400, 417–18, 108 S.Ct. 646, 657, n. 24, 98 L.Ed.2d 798 (1988).

**662** ■ ■

impacting Campbell's opportunity to defend. However, Campbell was aware of the district court's intended procedure well before the jurors approached the bench and did not object or assert her right. Her attorney did attend the bench conferences, did not object to the court's not recording them, and had no objection to the seating of the two jurors.

Although *Larson* stated that, normally, the court obtains a waiver of a defendant's presence at trial from the defendant personally, in open court, and on the record, the decision conceded that it may be possible to effectuate a waiver without a formalistic process. *Larson*, 911 F.2d at 396–97. Here, both defense counsel and Campbell acquiesced in her absence while defense counsel represented her interests for this part of the trial. *See Williams*, 438 A.2d at 1309.

On these particular facts, we find that Campbell did waive her right to be present at the bench conferences. Her presence in the courtroom permitted either her or defense counsel to object to her exclusion; however, both were silent. We do not think that this situation required the trial court to inquire, but rather permitted the court to assume, that Campbell had purposely decided to permit her attorney to represent her at the bench conferences. Our holding that defense counsel's failure to object to his client's absence from the bench conferences, failure to object to recording those conferences, and failure to object to the seating of the jurors waive her right to be present at a bench conference of prospective jurors is limited to these particular facts.

*Fair Trial Issues*

*Improper Opinions of Guilt*

■■■■■ Campbell alleges that the prosecutor committed per se reversible error by asking a police officer and the treating physician questions eliciting opinions that she was guilty of child endangerment. An investigating officer was asked:

Q ...., would you consider the conditions of the house unsafe for raising children?

A. Most definitely, yes.

Q. Would you consider it to be extremely unsafe to the individual that you observed the burns on, [HC]?

A. Yes.

The State argues that these statements followed testimony describing the lack of sanitation in Campbell's home, and were not opinions of guilt because, in context, the witness' testimony was relevant to elements of the crime that Campbell violated her duty of care as a parent. The State alleges that this testimony was relevant to connect the lack of sanitation in the home to the risk of infection posed to the burned child.

The prosecutor asked the treating physician the following:

Q. Is there, when somebody has second and third degree burns such as you stated HC had, is there a risk of infection on those kinds of burns?

A. Yes.

Q. Is it contributing to the endangerment of the child the longer you do not take them to the hospital?

A. Yes, there is a degree of problems with not managing a burn.

Q. Is that one of the things you are concerned with in burns like this is to take care of the wound as soon as possible so no infection begins?

A. Yes. Infection is a high risk. When we have a burn injury of this nature, we use sterile blankets.

Campbell argues that the doctor was asked for and gave his opinion that she was guilty of child endangerment for delaying in seeking medical treatment. The State argues that again this testimony was required to establish elements of the crime, and it remained for the jury to decide whether Campbell was guilty of child endangerment.

In this child endangerment prosecution, the State had to prove that Campbell acted with awareness of the probable consequences as opposed to making a mistake in judgment. Thus, it is relevant whether the conditions of the house were unsafe to a child with the type of injuries suffered by HC to prove that Campbell acted criminally when she delayed seeking medical care. The investigating officer's testimony was relevant to establish the

conditions of the home, and the doctor's testimony was relevant to establish that infection was likely and dangerous for the burn victim. Together, the testimony established necessary evidence that allowed the State to argue that Campbell, as a reasonable parent, should have known that she was endangering her child's health or life by delaying medical care for HC given the conditions that existed inside her home. Neither testimony amounts to an opinion that Campbell was guilty of child endangerment, and we find no error.

### Improper Admission of Photographs

■ Campbell next alleges that the prosecutor committed misconduct when he presented six allegedly gruesome photographs of HC's injuries that were not relevant to any issue the jury was required to decide and were likely to inflame or mislead the jury. Precisely, she contends that the photographs were taken after HC was admitted to the hospital and did not accurately reflect the injuries at 7:00 p.m. when Campbell made her decision not to seek medical care. The State argues that the babysitter, the only one to see HC completely undressed around 7:00 p.m., testified that the pictures accurately reflected HC's condition at that time.

■ Photographs are admissible evidence if authenticated, relevant, and not subject to any exclusionary rule. *Barnes v. State*, 858 P.2d 522, 526 (Wyo.1993).

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
>
> In the case of photographs, the proponent must establish that they are an accurate representation of the scene or object depicted.

*Id.* (citing W.R.E. 901(a)). The record confirms that the babysitter testified that the photographs depicted HC's injuries as she remembered them that evening. The photographs were relevant to show the severity of those injuries, and the severity of the injuries was relevant to the necessity of immediate medical attention. We find no error in either authentication or relevancy determinations.

These same arguments support Campbell's assertion that the photographs were unfairly prejudicial, and, having already found that the evidence established their accuracy and relevancy, we find no error in their admission.

### Prosecutorial Misconduct

■ Campbell claims that the prosecutor improperly made appeals to racial bias, appeals which challenged her constitutionally protected rights, appeals to facts not supported by evidence, and tried to improperly shift the burden of proof to her. Claims of prosecutorial misconduct are settled in reference to the entire record and hinge on whether a defendant's case has been so prejudiced that the defendant did not have a fair trial. *Arevalo v. State*, 939 P.2d 228, 230 (Wyo.1997). The propriety of a closing argument is considered in the context of the entire argument. *Id.* Reversal is warranted when a reasonable possibility exists that, absent the error, the appellant may have enjoyed a more favorable verdict. *Id.* No objections were made at trial, and we apply a plain error analysis. The elements of a plain error are that the record clearly show what occurred at trial, a clear and unequivocal rule of law must have been violated, and the violation must have adversely affected a substantial right of the accused. *Dudley v. State*, 951 P.2d 1176, 1179 (Wyo.1998).

■ The prosecutor did make many references to the fact that Boyer is white and HC's father is black as the reason that Boyer disliked the child and his motive for abusing the child in 1992 and upon her return to the home. The prosecution established this motive to prove that Campbell knew Boyer would abuse HC because of her parentage. Campbell and Boyer denied that either knew HC was not Boyer's child; however, the prosecution claimed that the child's mixed race is plain from her photographs, and that Boyer knew from seeing her that she was not his child. In reply, Campbell contends that the photographs do not plainly show HC's race. Our review of the record confirms the prosecution's use of HC's racial difference to establish motive, and we find no attempt to appeal to racial bias.

■ Campbell next claims that the prosecutor made improper comments when he argued that Campbell's duty of protection required her to give HC up for adoption. The State contends that adoption is a viable alternative to exposing the child to danger and Campbell's coercion or duress theory of defense required the prosecution to argue that Campbell had this option. Neither party provides authority or cogent argument for their claims; however, assuming the argument was error, Campbell has the burden of establishing that this argument violated a clear and unequivocal rule of law. She has not met that burden, and we will not find plain error.

■ In her last argument, Campbell claims that several times the prosecutor suggested to the jury that Campbell had the obligation to present affirmative evidence of her past injuries at the hands of Boyer. Twice objections were sustained to prosecution statements that Campbell had not produced evidence of those injuries and the following was argued by the prosecutor:

That thin blue line was crossed and Casey did nothing to protect [HC]. That is why we are here. Even Floid Boyer who took the stand said Casey never did anything to get out of this relationship. She didn't do anything at all. He says that she took the brunt of the abuse. She got slapped, but where were her broken bones? Where were her burns and what is it that she did to protect this child? It is not there. The evidence wasn't presented.

This argument was made after defense counsel's closing argument declared that Boyer was the abuser and Campbell the victim and the atrocious abuse she suffered was reason enough for the jury to return a verdict of not guilty. After that argument, the prosecution made the response quoted above without objection. Viewed in its entirety, we find no prejudice to Campbell.

Finally, Campbell asks this Court to find that the prosecutor did not conduct himself in a manner consistent with his duty as a minister of justice or with her right to due process by failing to comply with the laws of evidence and proper argument; however, we have found no prosecutorial misconduct on these points.

The order of judgment and sentence is affirmed.

MACY, Justice, specially concurring.

I agree with the result that the majority opinion reaches, but I offer this specially concurring opinion to express my continued disagreement with the majority's use of a constitutional balancing test to analyze the speedy trial issue. It is my opinion that this Court should limit its speedy trial discussions to an analysis under W.R.Cr.P. 48 which was intended to move us past the laborious and subjective constitutional analysis.

My views on this matter are fully explained in *Hall v. State*, 911 P.2d 1364, 1371–72 (Wyo.1996) (Macy, J., specially concurring), and in *Yung v. State*, 906 P.2d 1028, 1037–39 (Wyo.1995) (Macy, J., specially concurring), and I refer to them for a more in-depth discussion on this issue.